UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROBERT MILLS,

                    Plaintiff,          **No. 6:14-CV-6003(MAT)**
          - vs -                        **DECISION AND ORDER**

CAROLYN W. COLVIN, Acting
Commissioner  of Social Security,

                    Defendant.
_____

## I.   **Introduction**

Robert Mills ("Plaintiff"), represented by counsel, brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Supplemental Security Income ("SSI") and disability insurance benefits ("DIB"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

## II.  **Procedural History**

Plaintiff protectively filed applications for DIB and SSI on March 10, 2011, both of which  were denied. T.50-60, 128-42.[1] On July 30, 2012, Plaintiff, his attorney, and a vocational expert appeared at a hearing held before Administrative Law Judge Richard

---

[1]
    Citations to "T." refer to pages in the certified copy of the administrative transcript, filed by the Commissioner in connection with her Answer to the Complaint.

E. Guida ("the ALJ"), who issued an decision dated August 30, 2012, T.8-49, finding that Plaintiff has not been under a disability within the meaning of the Act from January 1, 2010, when he alleged he became disabled, through the date of the unfavorable decision.[2] The Appeals Council denied Plaintiff's request for review on December 20, 2013, making the ALJ's decision the final decision of the Commissioner. T.1-6. This timely action followed.

## III. Summary of the Administrative Record

### A. Relevant Medical Evidence Between January 1, 2010 and August 30, 2012

#### 1. Treating Psychiatrist

Plaintiff began treating with psychiatrist Ronald Spurling, M.D., on July 28, 2011. T.479. On August 10, 2011, Plaintiff presented for follow-up regarding his bipolar disorder and PTSD. T.426-29. Plaintiff reported that he was tolerating his medications well, aside from some sedation upon waking in the morning. He stated that his mood was more even, and he was less depressed. However, he complained of continued general anxiety and social anxiety. Plaintiff also reported continued daily use of marijuana, which he felt helped to "even out his

---

2

SSI cannot be paid prior to the date of Plaintiff's application. 20 C.F.R. § 416.501. To be eligible for DIB, Plaintiff must demonstrate disability on or before the date his insured status expired. See 42 U.S.C. § 423(c)(1); 20 C.F.R. §§ 404.101, 404.130-131. Plaintiff's date last insured is September 30, 2011. See T.11, 13, 150.

mood." T.426. Plaintiff presented as being appropriately groomed and dressed; his facial expression appeared pleasant; his motor activity was within normal limits; and his affect was calm. Plaintiff described his own mood as normal. His language processing and associative thinking  were intact; he was alert and oriented; and his memory, attention and concentration, and impulse control were all grossly intact. Judgment and insight were fair; and he evidenced no delusions, hallucinations, obsessions, preoccupations, or somatic thoughts. R427-28. During the examination, Plaintiff displayed anxiety periodically; his speech was pressured and rapid; his thought processes demonstrated circumstantial thinking; he showed increased tangentiality and some loosening of associations as the session progressed. Although Plaintiff had no "frank delusions," some of Plaintiff's statements "seem[ed] to border on the delusional." T.427-28.

Dr. Spurling diagnosed PTSD (309.81), Bipolar I Disorder Current Depressed Mild (296.51), and Cannabis Abuse Continuous (305.21). T.428. He noted that Plaintiff seemed to have some improvement with the addition of lithium and low-dose risperidone (Risperdal). T.428. Dr. Spurling prescribed a trial of guanfacine at bedtime to address Plaintiff's complaints of anxiety and difficulty with concentration. T.428. Dr. Spurling also counseled Plaintiff to cease using marijuana and cigarettes. Dr. Spurling opined that individual psychotherapy would not be particularly

beneficial at that time due to Plaintiff's "significant Axis I symptoms,"[3] but he expected that would change in the future. T.428.

Plaintiff returned to Dr. Spurling for follow-up on September 21, 2011, T.430-32, reporting that the medications were working very well for him, his mood was much more even, and he was sleeping well. However, his psoriasis (including ocular) had been worsening, so he stopped taking the lithium and other prescribed medications the previous day. R430. He also reported that he had been more social recently, and he continued to look employment but had not been offered many opportunities. Plaintiff reported continued daily use of marijuana. T.430. Dr. Spurling noted that Plaintiff had seemed very much improved on lithium, so it was unfortunate that he was unable to tolerate that medication due to a psoriasis flare. Dr. Spurling prescribed Depakote, and he instructed Plaintiff to restart Risperdal and guanfacine. T.431. Plaintiff was counseled to stop smoking cigarettes and marijuana (which Plaintiff continued to insist was helpful for him). Id.

On October 20, 2011, Plaintiff reported to Dr. Spurling that he was doing very well on the Depakote, and he liked it better than the lithium. T.467-69. He continued to occasionally use hydroxyzine as needed. T.467. Overall, he felt that his mood was "fine." T.467.

---

[3]

Axis I is the "top-level of the [Diagnostic and Statistical Manual of Mental Disorders] multiaxial system of diagnosis" and "represents acute symptoms that need treatment . . . ." http://www.psyweb.com/DSM_IV/jsp/Axis_I.jsp (last accessed May 19, 2015).

He slept about 7 hours per day, but he might stay up late reading and then sleep in. He denied any further difficulty with "rages" or anger episodes. T.467. He complained of stressors related to his finances and being isolated in his current housing situation, and he admitted to continued marijuana use. Id. Dr. Spurling concluded that Plaintiff was tolerating the Depakote well, and, symptomatically, seemed improved. T.468. Dr. Spurling continued Plaintiff's medications and added bupropion (Wellbutrin) in the morning to address Plaintiff's residual poor motivation and help him stop smoking. Dr. Spurling noted that Plaintiff believed very strongly that marijuana was helpful for him and he had no intention to cease using it. T.468.

On November 17, 2011, Plaintiff returned to Dr. Spurling reporting that he was doing very well on the Depakote, and stating that his mood was "very good." R470-72. His psoriasis had also dramatically improved. Plaintiff reported that he had been taking his medications more regularly. He also stated that he had stopped smoking marijuana altogether, at which point he started having nightmares. T.470. However, his sleep was now normal, and he was sleeping approximately eight hours per night. Id. Plaintiff also reported that the Wellbutrin was initially helpful and he had stopped chain-smoking cigarettes, but after he stopped smoking marijuana, he increased his cigarette smoking again. Id. He was using hydroxyzine occasionally as needed. He denied any further

difficulty with "rages" or anger episodes. Dr. Spurling concluded that Plaintiff was tolerating the Depakote well, and symptomatically seemed greatly improved. T.471. He increased the dosage of Wellbutrin to further address Plaintiff's residual symptoms of poor motivation and to help him reduce his smoking. Id. He encouraged Plaintiff to continue abstinence from marijuana. T.471-72.

On January 19, 2012, Plaintiff returned to Dr. Spurling for follow-up. T.473-75. Plaintiff stated that he was "not too good" that day, and he complained of having frequent "little tantrums," frustration, and inability to focus or accomplish tasks. T.473. Plaintiff thought he was drinking too much coffee and  admitted that he had "not been taking his medication like he should be." T.473. Though he was "very evasive about exactly how frequently" he was taking the medication, it seemed to Dr. Spurling that he was primarily treating himself "as needed" with hydroxyzine and marijuana. Id. Plaintiff complained of frequently not wanting to get off of the couch, and difficulty with keeping his schedule. However, he admitted to shampooing his carpets, as he was thinking of selling his mobile home and moving to Florida. He thought moving there might improve his mood, be easier on his finances, and provide increased job prospects. Plaintiff admitted to smoking a lot of cigarettes since stopping the Wellbutrin, as well as two marijuana joints per day. He complained of nightmares related to

-6-

his previous incarceration and continued bothersome psoriasis symptoms. He also complained of multiple stressors, including his history of a felony conviction, undergoing a thoracotomy, not having seen his daughter in 25 years, and being relatively isolated where he lived in the country. Clinical examination findings were essentially unchanged, except that Plaintiff demonstrated preoccupations. T.474. Dr. Spurling concluded that Plaintiff had been doing much better at his last two visits (i.e., had a much better and more stable mood with increased motivation), but today he had evidently largely stopped taking his medications and gone back to using marijuana daily and smoking cigarettes heavily.

Dr. Spurling noted that Plaintiff was "perseverative" on multiple stressors, and thinking about a "geographical solution." T.474-75. Plaintiff requested that Dr. Spurling treat him with stimulants to help with his difficulties with attention and focus, but Dr. Spurling refused, as Plaintiff was not taking his other medications regularly. T.475. Dr. Spurling also noted his concern about Plaintiff's relapse of marijuana use, and that, while Plaintiff may feel that it was helping with his anxiety, it clearly was making his motivation and other aspects of his illness worse. Dr. Spurling urged Plaintiff to take his prescribed medications regularly, and again counseled him to limit and ultimately stop smoking cigarettes and marijuana.

Dr. Spurling completed a form titled, "Evaluation of the Residual Functional Capacity of the Mentally Impaired Patient", on February 10, 2012. T.476-79. At that point, he had seen Plaintiff between July 28, 2011, and January 19, 2012, but indicated that his opinion regarding Plaintiff's limitations commenced as of January 1, 2010. T.479. Dr. Spurling opined that Plaintiff had "fair" ability (defined in the form as "the ability to function in this area is seriously limited and will result in periods of unsatisfactory performance at unpredictable times") to remember detailed instructions; respond appropriately to supervision (citing difficulty with irritability and mood changes); function independently on a job (citing decreased concentration and focus); ability to complete a normal workday on a sustained basis (citing sleep pattern deregulation); exercise appropriate judgment (citing impulsivity and difficulty with processing instructions); concentrate and attend to a task over an eight-hour period (citing difficulty concentrating); maintain social functioning (citing irritability and mood changes); and tolerate customary work pressures in a work setting (citing poor stress tolerance with irritability and mood changes). T.477-78. Dr. Spurling opined that Plaintiff had "good" (defined as "the ability to function in this area is limited but satisfactory") abilities in all other listed areas of functioning, including the ability to: comprehend and carry out simple instructions, remember work procedures, respond

-8-

appropriately to co-workers, abide by occupational rules/regulations, make simple work-related decisions, and be aware of normal hazards and make necessary adjustments to avoid those hazards. T.476-78. Dr. Spurling opined that Plaintiff's condition was likely to deteriorate if he were placed under stress, especially the stress typically found in the workplace. However, Dr. Spurling was not aware of such deterioration having occurred in the past, in light of Plaintiff's limited employment since his incarceration. T.478. Dr. Spurling indicated that Plaintiff's impairments had lasted or was expected to last for at least 12 months and were likely to produce "good days" and "bad days." Consequently, Plaintiff likely would be absent from work about four days per month. T.479. Dr. Spurling did not indicate that there were any restrictions on the number of hours or days that Plaintiff could be present at a work site.

On March 19, 2012, Plaintiff returned to Dr. Spurling for follow-up. T.481-83. Plaintiff reported that things were "fair." He reported that he was taking the Wellbutrin in the morning, and taking hydroxyzine as need if he gets "overexcited." Otherwise, he was not taking any of the other prescribed medications. He also reported continued use of marijuana and cigarettes, and he continued to bite his nails. His sleep was "okay" and his motivation was "all right". He got out of the house sometimes, mostly to go to town or to walk the dog. Plaintiff complained of

occasionally developing some anxiety and pacing behaviors, but then he would take a hydroxyzine, which helped. He also reported relief because his teeth were repaired, and he had been able to put away some money, which helped his anxiety about finances. Plaintiff reported that his roommate had a new job and was now out of the house more often. He also intended to take a short trip or vacation. On examination revealed, Plaintiff's speech was clear and appropriate, and other findings were essentially unchanged. Dr. Spurling concluded that, despite Plaintiff's ongoing regular use of marijuana, and his self-discontinuation of most of the prescribed medications, he "seem[ed] to be doing fairly well." T.483. He noted that Plaintiff did report continued use of Wellbutrin and hydroxyzine, as needed. Dr. Spurling again counseled Plaintiff on marijuana and smoking cessation. Plaintiff declined the offer to be trialed on other medications, Since Plaintiff was on minimal medications and "seem[ed] to be fairly stable," id., Plaintiff would be seen in 3 months.

### 2.    Other Physicians With Whom Plaintiff Treated

In an undated report, Plaintiff's primary care physician Dr. Thaddeus Zyleszewski stated that he had first seen Plaintiff on July 21, 2011, and last examined him on August 15, 2011. T.423-24; T.441-46 (7/21/11), T.447-51 (8/15/11 visit). Dr. Zyleszewski declined to check any boxes relating to specific functional limitations. T.423-24. He opined that Plaintiff required "minimal

stress exposure, minimal concentration requirement secondary to mental/psychiatric [issues]," and that Plaintiff had no physical limitations. T.424. Dr. Zyleszewski stated that these restrictions were expected to last longer than 90 days. Dr. Zyleszewski also checked a box indicating that, if substance abuse also were found, Plaintiff's impairments would be expected to continue even if his use of drugs and/or alcohol were to cease.

Plaintiff treated with Dr. Richard R. Stout for various eye complaints between August 2011, and March 2012. T.485-96. Plaintiff reported on March 27, 2012, that he thought his eyes bothered him because he was on the computer for approximately eight hours per day, and his "eye sight comes back better when not on [the] computer." T.496. Dr. Stout's impressions were rosacea, dermatochalasis, and refractive error. T.496.

### 3.   Consultative Examinations

On June 3, 2011, psychologist Dr. Christina Caldwell examined Plaintiff at the Commissioner's request. T.377-81. Plaintiff's manner of relating, social skills, and overall presentation were adequate; his attention and concentration, and recent and remote memory were intact; and his intellectual functioning was average. T.378-79. Dr. Caldwell's Axis I diagnoses were as follows: learning disability (previous diagnosis); attention deficit disorder (previous diagnosis); depressive disorder, not otherwise specified ("NOS"); post-traumatic stress disorder ("PTSD"); and panic

disorder without agoraphobia. T.380. Axis III (physical condition) diagnoses were left shoulder pain, poor eyesight, and difficulty hearing. T.380. Dr. Caldwell opined that Plaintiff could follow and understand simple directions instructions and perform simple tasks independently; maintain attention and concentration; and maintain a regular schedule. However, Dr. Caldwell, stated, he is unable to learn new tasks easily; he is unable to perform complex tasks independently; he is unable to make appropriate decisions; he is unable to relate adequately with others; and he is unable to appropriately deal with stress. T.380. According to Dr. Caldwell, these difficulties were caused by Plaintiff's Axis I diagnoses, physical limitations, and cognitive deficits. The results of her evaluation "appeared to be consistent" with Plaintiff's allegations. T.380. His prognosis was "fair." T.380. Dr. Caldwell recommended that Plaintiff pursue individual psychotherapy and psychiatric intervention. T.380.

Also on June 3, 2011, internist Dr. Kalyani Ganesh performed a consultative internal medicine examination at the Commissioner's request. T.382-85. Dr. Ganesh diagnosed Plaintiff with a history of left shoulder third-degree dislocation, anxiety, depression, and psoriasis. T.384. Plaintiff had no gross physical limitations in sitting, standing, walking, or using his right upper extremity; but he had mild to moderate limitations in lifting, carrying, pushing, and pulling with the left upper extremity. T.384.

On June 9, 2011, State agency medical consultant Dr. A. Hochberg, a psychologist, reviewed the file and concluded that Plaintiff had "mild" difficulties in maintaining concentration, persistence, or pace; and no restriction in activities of daily living or difficulties in maintaining social function; and therefore concluded that Plaintiff did not have a "severe" mental impairment. T.386-99.

## IV.  Standard of Review

Title 42 U.S.C., § 405(g) authorizes district courts "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." This Court's function is not to determine de novo whether a claimant is disabled, Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (citation omitted), but rather to evaluate whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. E.g., Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)). A deferential standard does not apply to the Commissioner's application of the law, however, and this Court independently must determine if the Commissioner applied the correct legal standards in arriving at her decision. See Townley v. Heckler, 748 F.2d 109,

112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal.").

## V.    The ALJ's Decision

The ALJ found that Plaintiff has not engaged in any substantial gainful activity for the requisite time; that he has "severe" impairments of degenerative joint disease, depressive disorder, PTSD, panic disorder, and cannabis abuse; and that these "severe" impairments, either singly or in combination, do not meet or equal a listed impairment. T.13-15; 20 C.F.R. §§ 404.1520(b)-(d), 416.920(b)-(d); 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ assessed Plaintiff's residual functional capacity (RFC), and concluded he had the ability to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations: occasional pushing, pulling, and overhead reaching using the non-dominant upper extremity; and never crawling or climbing ladders, ropes, or scaffolds. With regard to the skill level of work, Plaintiff is limited to performing only unskilled work that involves simple, routine, and repetitive tasks; simple, work-related decisions; and few, if any, workplace changes; and only occasional interactions with supervisors and co-workers; and no contact with the public. T.15-21. At step four, the ALJ found that Plaintiff could not perform his past relevant work. T.21. At step five, the ALJ relied on the vocational expert's testimony to concluded that there are jobs existing in significant

numbers in the economy that Plaintiff can perform. T.21-22. Accordingly, the ALJ entered a finding of not disabled.

## VI.  Discussion

### A.  Failure to Give Controlling Weight to Dr. Spurling's Opinion (Plaintiff's Point 1)

Plaintiff contends that the ALJ erroneously gave "little weight" to Dr. Spurling's opinion and failed to identify "good reasons" any legally sufficient reason for doing so, as required by the regulations. See, e.g., 20 C.F.R. § 404.1527(d)(2). As discussed below, the Court finds that the ALJ erred in failing to provide "good reasons" for declining to accord controlling weight to Dr. Spurling's treating source opinion assessing Plaintiff's mental abilities in fourteen areas of intellectual functioning.

The Second Circuit has explained that "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record. . . ." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (internal and other citations omitted). When an ALJ declines to accord controlling weight to a treating physician's opinion, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion[,]" id. (quoting 20 C.F.R. § 404.1527(d)(2)), such as "(i) the frequency of examination and the length, nature and extent

-15-

of the treatment relationship; (ii) the evidence in support of the
treating physician's opinion; (iii) the consistency of the opinion
with the record as a whole; [and] (iv) whether the opinion is from
a specialist . . . ." Id. (citing 20 C.F.R. § 404.1527(d)(2)). The
regulations also specify that the Commissioner "will always give
good reasons" for the weight given to a treating source opinion.
20 C.F.R. § 404.1527(d)(2); accord 20 C.F.R. § 416.927(d)(2).

The Court agrees that Dr. Spurling is a treating source for
purposes of applying the treating physician rule. The regulatory
factors regarding the length of the treatment relationship and the
nature of Dr. Spurling's practice clearly favor giving controlling
weight to his opinion. As noted above, Dr. Spurling is a specialist
in the field of psychiatry, and he treated Plaintiff on a
consistent basis over several years. However, the ALJ found
Dr. Spurling's opinion entitled to only "little weight". The ALJ's
rationale for this conclusion consists of the following two
sentences:

> [D]espite giving the claimant "fair" to "good" rating,
> [Dr. Spurling] suggested that the claimant would be
> absent four (4) days per month, which would preclude
> competitive employment. There is little in Dr. Spurling's
> records that support this finding, particularly in light
> of the claimant's noncompliance with medications.

Decision, p. 10.

As an initial matter, it is apparent that there is a
disconnect between the ALJ's understanding of the terms "fair" and
"good" and Dr. Spurling's understanding of those terms as defined

in the form he completed. In rejecting Dr. Spurling's opinion as internally inconsistent, the ALJ evidently gave "fair" its dictionary meaning, e.g., "sufficient but not ample: adequate[.]"[4] However, the form defined "fair" as meaning that the patient's ability to function was "seriously limited and will result in periods of unsatisfactory performance at unpredictable times." T.416-19. Likewise, the form defined "good" as "limited but satisfactory", and thus defined "good" in a more restricted sense than its typical dictionary definition, e.g., "of a favorable character or tendency[.]"[5] Contrary to the ALJ's conclusion, Dr. Spurling's assessment of "fair" to "good" ratings in various work-related areas–using the definitions provided on the form–is wholly consistent with his opinion that Plaintiff would be absent four days per month from work due to his impairment-related limitations. This reason, because it is based on the ALJ's misreading of the record, cannot be a "good reason" for discounting Dr. Spurling's opinion. See Briscoe v. Astrue, 892 F. Supp.2d 567, 580 (S.D.N.Y. 2012) ("[I]nsofar as the ALJ relied on this perceived [but not actual] inconsistency as a basis for giving little weight to [treating physician] Dr. Contreras's opinion, this would reflect

---

[4] http://www.merriam-webster.com/dictionary/fair (definition 10a) (last accessed May 19, 2015).

[5] http://www.merriam-webster.com/dictionary/good (definition 1a(1)) (last accessed May 19, 2015).

that the ALJ has not proffered an acceptable basis for discrediting Dr. Contreras's findings.").

The ALJ's second reason for according only little weight to Dr. Spurling's opinion-that there is "little in [his] records that support this [restrictive] finding, particularly in light of the claimant's noncompliance," is so vague and conclusory as to be meaningless. The reference to Plaintiff's lack of compliance with his medication regimen simply does not make any sense in the context of the sentence. Accordingly, the ALJ's second reason for discounting Dr. Spurling's opinion also is not a "good reason" for purposes of the regulations. See Lane v. Astrue, 267 F.R.D. 76, 84 (W.D.N.Y. 2010) (finding reversible error where "[t]he ALJ did not give controlling weight to the opinions of [treating physicians] Brubaker and Carstens, and instead relied on the opinion of Morawski, a non-treating physical therapist who examined Plaintiff on one occasion, stating merely that such opinions by Brubaker and Carstens were 'not well supported'"; finding "[s]uch a cursory statement [to be] insufficient"). Furthermore, the "post hoc rationalizations" offered by the Commissioner as to why the ALJ justifiably rejected Dr. Spurling's opinion "are not entitled to weight by a reviewing court." Hill v. Astrue, No. 1:11-CV-0505(MAT), 2013 WL 5472036, at *7 (W.D.N.Y. Sept. 30, 2013) (citing, inter alia, Demera v. Astrue, No. 12-CV-432(FB), 2013 WL 391006, at *3 n.3 (E.D.N.Y. Jan. 24, 2013) ("The

Commissioner attempts to justify the ALJ's determinations by noting that Dr. Karpe's opinion was inconsistent with the record evidence and that Dr. Vosseller's opinion was conclusory on an issue reserved for the Commissioner. The ALJ did not provide these explanations, however, and post hoc rationalizations for the ALJ's decision are not entitled to any weight.").

The Second Circuit has observed that courts "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician['s opinion[,]" and has instructed that courts "[should] continue remanding when [they] encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; see also("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (citation omitted). Because the "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand[,]" Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999), this case must be remanded for that purpose. E.g., Briscoe, 892 F. Supp.2d at 580; see also Richardson v. Barnhart, 443 F. Supp.2d 411, 424-25 (W.D.N.Y. 2006) (remanding for a second time where the ALJ's decision "did not give good reasons, supported by substantial evidence, for failing to assign controlling weight to the opinion of a treating source" and the ALJ "failed to follow the treating

physician rule by ignoring substantial evidence of record and by committing legal error in his analysis of [the treating physician]'s opinions").

### B.   Other Errors

As sufficient bases exist for ordering the matter remanded, the Court need not determine whether Plaintiff's other alleged errors warrant remand. The Court will briefly address several other errors asserted by Plaintiff so that they may be avoided on remand.

#### 1.   Errors in the RFC Assessment

Plaintiff argues that to support his RFC finding, the ALJ was required "to do more than merely catalogue the medical records." Plaintiff's Brief (Dkt #7-1) at 18. The Court agrees that "[i]t is well-settled that '[t]he RFC assessment must include a narrative discussion describing *how the evidence supports each conclusion,* citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Hogan v. Astrue, 491 F. Supp.2d 347, 354 (W.D.N.Y. 2007) (quotation and citation omitted); emphasis supplied).

Here, the ALJ gave his conclusion as to Plaintiff's RFC assessment and proceeded to summarize the medical evidence without discussing *how* the medical evidence supported the various aspects of his RFC assessment. This was error. See Naumovski v. Colvin, No. 1:12-CV-0080(MAT), 2014 WL 4418101, at *8 (W.D.N.Y. Sept. 8, 2014) (finding error warranting remand where, after stating the

plaintiff's RFC, "the ALJ merely summarized the medical evidence
and did not discuss how the medical evidence supported his
conclusion that Plaintiff could 'sit for an eight-hour workday with
only normal breaks and meal periods; stand and/or walk on an
occasional basis, up to two hours in an eight-hour workday; and
lift and carry up to 10 pounds on an occasional basis'"). Here,
Plaintiff has several mental impairments which the ALJ found
"severe" at step two (PTSD, depressive disorder, and panic
disorder). The ALJ's RFC assessment included some limitations
ostensibly related to these mental impairments (i.e., Plaintiff is
"limited to simple, work-related decisions and few, if any,
workplace changes" and "only occasional interactions with
supervisors, co-workers, and no contact with the public"). However,
the ALJ did not assign significant weight to any of the opinions in
the record from treating or examining sources regarding Plaintiff's
mental capabilities and limitations. "Because the ALJ simply
recited the medical record, and failed to cite to any specific
medical opinions to support his RFC findings, the Court is unable
to determine if the ALJ improperly selected separate findings from
different sources, without relying on any specific medical
opinion." Naumovski, at 2014 WL 4418101, at *8 (citations omitted);
see also Girolamo v. Colvin, No. 13-CV-06309MAT, 2014 WL 2207993,
at *8 (W.D.N.Y. May 28, 2014) (citations omitted).

### 2.   Errors in the Credibility Assessment

Under the regulations, an ALJ first must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms he alleges, and if so, the ALJ then must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. See 20 C.F.R. § 404.1529(a), (c)(3)(i)-(vii)). Here, the ALJ found Plaintiff to be "not fully credible" but failed to discuss the symptom-related factors set forth in the regulations and illogically used his own RFC assessment as the basis to disbelieve Plaintiff's subjective complaints. These errors in the ALJ's credibility analysis require remand. See, e.g., Reff v. Commissioner of Social Sec., No. 8:13-CV-1326(LEK/ATB), 2015 WL 1178764, at *9 (N.D.N.Y. Mar. 13, 2015) ("[W]hile the ALJ articulated the proper two-step standard for the credibility analysis, he did not discuss the appropriate symptom-related factors, but, instead, made an inadequate, conclusory finding regarding plaintiff's credibility."); see also Quinones v. Colvin, No. 6:13-cv-06603(MAT), 2014 WL 6885908, at *7 (W.D.N.Y. Dec. 8, 2014) ("It is erroneous for an ALJ to find a claimant's statements not fully credible because those statements are inconsistent with the ALJ's own RFC finding.") (citations omitted). On remand, the Commissioner should properly evaluate Plaintiff's credibility by

considering and referencing the symptom-related factors set forth
in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).

## VII. Conclusion

For the foregoing reasons, the Commissioner's denial of DIB
and SSI was erroneous as a matter of law. Therefore, the
Commissioner's motion for judgment on the pleadings (Dkt #9) is
denied. Plaintiff's motion for judgment on the pleadings (Dkt #7)
is granted to the extent that the Commissioner's decision is
reversed, and the matter is remanded for further administrative
proceedings consistent with this Decision and Order. In particular,
the ALJ is directed to (1) re-evaluate Dr. Spurling's treating
source opinion and, if the ALJ elects not to accord it controlling
weight, give "good reasons" in accordance with the regulations for
the decision not to assign it controlling weight; (2) re-assess
Plaintiff's RFC and provide a narrative discussion describing how
the evidence supports each conclusion, citing specific medical
facts (e.g., laboratory findings) and nonmedical evidence (e.g.,
daily activities, observations); and (3) re-evaluate Plaintiff's
credibility under the proper two-step standard, discussing the
appropriate symptom-related factors set forth in the regulations.

**SO ORDERED.**

S/Michael A. Telesca

---

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     May 21, 2015
           Rochester, New York